UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                             :
**NIA JASMINE REYNOLDS**,                                    :
                                                             :
                       Plaintiff,   :
                                                             :  **MEMORANDUM DECISION AND**
            – against –                       :  **ORDER**
                                                             :
                                                             :  21-CV-6111 (AMD) (TAM)
**THE CITY OF NEW YORK**; **BROOKLYN**                       :
**PRIME INC.**, dba Brooklyn Prime Bar and                   :
Restaurant; **LESLEY CADOGAN**, as Owner,                    :
Brooklyn Prime Bar and Restaurant; **TERRI ANN**             :
**WILLIAMSON**, as Manager, Brooklyn Prime Bar               :
and Restaurant; **ROBERT J. DANTONE**, as                    :
Captain, Police Department City of New York;                 :
**TERRENCE E. CREIGHTON**, as Lieutenant,                    :
Police Department City of New York; **MICHAEL**              :
**H. SOLOWITZ**, as Lieutenant, Police Department            :
City of New York; **CHRISTOPHER J.**                         :
**MULLER**, as Sergeant, Police Department City of           :
New York; **ROBERT GRELLA**, as Police Officer,              :
Police Department City of New York; **MAYER**                :
**SCHWARTZ**, as Police Officer, Police Department           :
City of New York; **PETER D. WOODBURN**, as                  :
Police Officer, Police Department City of New                :
York; **SEAN F. KELLEHER**, as Police Officer,               :
Police Department City of New York; and **ROHAN**            :
**L. SHAW**, each individual defendant sued in their         :
individual and official capacities as employees of           :
Defendant THE CITY OF NEW YORK or                            :
Defendant BROOKLYN PRIME, INC.,                              :
                                                             :
                      Defendants.   :
                                                             :
------------------------------------------------------------ X

**ANN M. DONNELLY**, United States District Judge:

      The plaintiff was injured when an intoxicated, off-duty police officer drove his car into the car in which she was a passenger. She brings this action against the City of New York, nine New York City police officers, Brooklyn Prime Inc. (d/b/a Brooklyn Prime Bar and Restaurant), and Brooklyn Prime's owner and manager, and asserts *Monell* claims, a claim for denial of

access to the courts, and state law claims for negligence and violation of the New York State Dram Shop Act, General Obligations Law §§ 11–100 *et seq*. (ECF No. 1.) Before the Court are the defendants' motions to dismiss. (ECF Nos. 76, 78, 79, 82.)[1] For the reasons explained below, the motions are granted.

## BACKGROUND[2]

### I. The Car Accident

On December 8, 2019, the plaintiff and two friends — Kwesi Vidale and Joanna Dixon — went to a birthday party in Manhattan, then to a night club in Queens, and finally to a café in Brooklyn. (ECF No. 33 ¶¶ 27, 32, 37.) The plaintiff drank alcohol at the nightclub but did not know whether Vidale did. (*Id.* ¶ 34.) Sometime after 4:00 a.m., the plaintiff and her friends got into Vidale's car, and Vidale drove toward the plaintiff's house. (*Id.* ¶¶ 40, 42–43.) Neither the plaintiff nor Dixon wore seatbelts. (*Id.* ¶ 52.)

In the meantime, Robert Shaw, an off-duty police officer, was drinking at the Brooklyn Prime Bar and Restaurant, a "Caribbean restaurant with full-service bar" in Brooklyn. (*Id.* ¶ 83.) Shaw did not leave the restaurant until almost 5:00 a.m., when, then intoxicated, he got into his car and started driving. (*Id.* ¶¶ 84, 85.) He "made a left turn onto Foster Avenue" and "immediately accelerated to seventy-eight . . . miles per hour increasing to eighty-five . . . miles per hour." (*Id.* ¶ 88.) As Vidale "rolled through the stop sign[ and] attempted to make a left-hand turn onto the westbound side of Foster Avenue" (*id.* ¶ 46), Shaw "activated his brakes,

---

[1] The City, NYPD Captain Dantone, and Police Officers Sean F. Kelleher, Robert Grella, Mayer Schwartz, Peter D. Woodburn, Michael H. Solowitz, and Christopher J. Muller moved to dismiss. (ECF Nos. 76, 78, 79, 82.) Brooklyn Prime and its owner Lesley Cadogan and manager Terri Ann Williamson, and Police Officer Terrence E. Creighton have not yet appeared in this action. Former Police Officer Rohan Shaw did not file a motion to dismiss.

[2] For purposes of these motions, the Court accepts as true the factual allegations in the amended complaint and draws all reasonable inferences in the plaintiff's favor. *See Town of Babylon v. Fed. Hous. Fin. Agency*, 699 F.3d 221, 227 (2d Cir. 2012).

slowing down to fifty-one []miles per hour" and collided with Vidale's car on the passenger side (*id.* ¶ 88), killing Dixon and seriously injuring the plaintiff (*id.* ¶¶ 56–60). Shaw's car "came to a final rest just east of the intersection of Foster Avenue and East 55th Street." (*Id.* ¶ 48.) Vidale got out of the car and ran away. (*Id.* ¶ 49.)

The plaintiff has no memory of the car accident. (*Id.* ¶ 53.) She "recalls awakening inside of Kings County Hospital as the medical personnel informed her that they needed to perform emergency surgery." (*Id.* ¶ 54.) She was hospitalized from December 8, 2019 through December 28, 2019 (*id.* ¶ 58) and had a five-hour "surgery to repair a crushed pelvis and a fractured sacrum" (*id.* ¶ 55). She also had "bleeding on the brain, a fractured skull," "four broken ribs, liver laceration," and "lung contusions." (*Id.* ¶ 56.) She still has "hearing loss and frequent ringing in her ear" (*id.* ¶ 57) and "has been unable to bear any weight on her legs or perform independently most regular daily tasks" (*id.* ¶ 59).

## II. Post-Accident Events and Investigation

After the car accident, Shaw made multiple phone calls. (*Id.* ¶¶ 89–92.) He reported the collision to 911; his speech was slurred and he did not "identif[y] himself as a member of the service as required by department policy." (*Id.* ¶ 90.) He also called his fiancé, as well as Brooklyn Prime manager Terri Ann Williamson and Police Officer Terrence E. Creighton. (*Id.* ¶¶ 89, 91, 92.)[3]

Police Officers Woodburn, Schwartz, and Solowitz arrived at the scene sometime between 5:00 a.m. and 6:00 a.m. (*Id.* ¶¶ 99, 106, 108, 117.) Shaw told them that he "was traveling eastbound on Foster Avenue after having visited his 'girlfriend'" when the driver of the

---

[3] In a March 16, 2021 interview, Williamson "denied . . . knowing . . . S[haw and] anything about the motor vehicle accident despite his cellphone records indicating she was the first [person Shaw] called" after the accident. (ECF No. 33 ¶ 149).

3

Mazda collided with his car.  (*Id.* ¶¶ 102, 112.)  Damage to the front-end of Shaw's car and driver side of the Mazda "clearly indicate[d] [that Shaw] T-boned the other vehicle."  (*Id.* ¶ 103.)

The plaintiff maintains that the officer defendants, including Police Officer Kelleher and Captain Dantone, did not activate their body-worn cameras as NYPD policy required, and did not conduct a proper investigation.  (*Id.* ¶¶ 93–94, 96–97, 151.)  The plaintiff claims that, because of these failures, there are no recordings of the defendants' interactions with Shaw while he was intoxicated.  (*Id.* ¶¶ 93–94, 96–97.)  The plaintiff also claims that Creighton came to the accident scene while he was "on pre-separation leave . . . in violation of department policy."  (*Id.* ¶ 135.)  The plaintiff says that Creighton "intentionally interfered with the criminal and serious misconduct investigations of [Shaw,] . . . including showing up to the crime scene and retrieving [Shaw's] off-duty Glock handgun."  (*Id.* ¶ 95.)  Creighton did not notify any supervisor that he was at the scene, and accessed the accident scene because it was not secure as "consistent with department policy."  (*Id.* ¶ 137.)  Moreover, Solowitz instructed Shaw to "wait inside of his department vehicle unsupervised which is inconsistent with department policy."  (*Id.* ¶¶ 111.)

Shaw told Solowitz that he drank "one . . . shot of patron two . . . hours prior to the accident."  (*Id.* ¶ 113.)  Solowitz and Muller claimed that there were no "indications that . . . [Shaw] was intoxicated and unfit for duty."  (*Id.* ¶ 109.)  Solowitz said that he smelled a "strong odor of cologne" on Shaw, but not alcohol.  (*Id.* ¶ 114.)  However, Officer Matthew Grillo smelled "a strong odor of alcohol," and observed that Shaw was "swaying."  (*Id.* ¶ 117.)  At around 6:00 a.m., Officer Grillo had Shaw take a Preliminary Breath Test ("PBT"), which Shaw failed; the test showed that Shaw's blood alcohol level was 0.108.  (*Id.*)

Shaw was arrested after the PBT and transported to the Intoxicated Driver Testing Unit at the 78th Precinct.  (*Id.* ¶ 118.)  Muller, who processed Shaw's arrest, got a warrant to take Shaw's

4

blood for further testing. (*Id.* ¶¶ 119, 128; ECF No. 78-3 (Ex. 1, Warrant to Withdraw Blood).) A nurse drew Shaw's blood at 1:10 p.m., approximately eight hours after the car accident. (*Id.* ¶ 129.) The blood test showed "Ethanol 0.01 g% (HSGC), and no other drugs." (*Id.* ¶ 132.)

None of the officer defendants who responded to or investigated the accident was "criminally charged" (*id.* ¶ 152) for not activating their body cameras and not investigating the car accident properly (*id.* ¶ 151). Creighton, Solowitz, and Muller received "Schedule A Command Disciplines" and lost two days of vacation. (*Id.* ¶ 150.) Woodburn, Schwartz, and Robert Grella "received Letters of Instruction." (*Id.*) Dantone and Kelleher were not disciplined. (*Id.*)

On December 9, 2019, the Kings County District Attorney's Office declined to prosecute Shaw because there was "insufficient evidence to prove [that the] defendant was intoxicated/impaired" and because "[Muller] did not note any indication of impairment/intoxication and deemed [the] defendant fit for duty" before the PBT test. (*Id.* ¶ 131; ECF No. 78-4 (Ex. 2, Decision to Decline Prosecution of Shaw).) Although Muller "deemed [the] defendant unfit for duty due to signs of impairment/intoxication" after he saw the PBT test results, "the PBT test is inadmissible to prove impairment/intoxication." (*Id.* ¶ 131.) On December 16, 2019, Shaw received "five . . . department charges essentially mirroring the arrest for driving while under the influence" (*id.* ¶ 133), which were amended on April 7, 2020 (*id.* ¶ 140).[4]

Shaw was also arrested after a November 2006 car accident "for driving while under the influence and related charges" (*id.* ¶ 71), for which he received "five . . . department charges essentially mirroring the arrest for driving while under the influence" (*id.* ¶ 72). Shaw "pled

---

[4] The complaint does not describe the amendments.

5

guilty to VTL § 1192 Driving While Ability Impaired" and was sentenced to "a ninety . . . day suspension of his driving privileges, [a] fine[ of] three hundred . . . dollars, [and] mandatory alcohol treatment." (*Id.* ¶ 73.)  He was also required to "perform mandatory roll-call instruction for members of the department for . . . thirty-five . . . outgoing platoons regarding the consequences of driving while under the influence." (*Id.*)  In May 2013, Shaw pled guilty to "rate jumping a version of insurance fraud and [was] penalized with the forfeiture of twenty-five . . . vacation days." (*Id.* ¶ 76.)  He also "work[ed] without authorization as a security officer with Elite Investigations and patronized a club." (*Id.* ¶ 71.)[5]

## LEGAL STANDARD

A complaint must be dismissed under Rule 12(b)(6) if it does not "state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  The complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible on its face when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

At the motion to dismiss stage, the Court "is generally limited to the facts as presented within the four corners of the complaint, to documents attached to the complaint, or to documents incorporated into the complaint by reference."  *Williams v. Time Warner Inc.*, 440 F. App'x 7, 9 (2d Cir. 2011) (quoting *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002)).  The Court may consider any "documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . .

---

[5] According to another record, Shaw was the subject of an "[u]nsubstantiated" accusation that he had "criminal association through alleged drug sales, [with] persons accused of a double homicide . . . and gang affiliations with the Bloods."  (*Id.* ¶ 77.)

6

documents either in [the] plaintiff['s] possession or of which [the] plaintiff[ ] had knowledge and relied on in bringing suit," as long as the plaintiff relied on the "terms and effect of a document in drafting the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (citation omitted).

The Court considers the 2014 study by the New York City Department of Transportation ("DOT") and demographics based on census data, which the complaint incorporates by reference. *See Does 1-2 v. Hochul*, 632 F. Supp. 3d 120, 127 n.1 (E.D.N.Y. 2022) ("When considering a motion made pursuant to Rule 12(b)(6), the Court may take judicial notice of documents retrieved from official government websites, or other relevant matters of public record." (internal quotation marks and citations omitted)).[6] The Court does not consider the notice of a deposition of a DOT employee that the plaintiff submitted with her response to the defendant's motion because she did not attach it to or refer to it in the complaint. *See McLennon v. City of New York*, 171 F. Supp. 3d 69, 88 (E.D.N.Y. 2016) ("To be incorporated by reference, the complaint must make a clear, definite and substantial reference to the documents."). The Court does not consider the affidavits that the defendants included with their motions to dismiss, except to the extent they quote the complaint or documents that the complaint incorporates by reference. *See Kaplan v. Wings of Hope Residence, Inc.*, No. 18-CV-2972, 2018 WL 6437069, at *4 (E.D.N.Y. Dec. 7, 2018) (declining to consider "additional factual assertions" in affidavits submitted on motion to dismiss when the affidavits "assert[ed] facts in greater detail than those in the complaint" (citation omitted)).

---

[6] *See Foster Avenue: Traffic Calming & Pedestrian Safety Improvements*, N.Y.C. Dep't of Transp. (May 21, 2014), https://www.nyc.gov/html/dot/html/about/projects-2014.shtml.

7

**DISCUSSION**

I. *Monell* **Claims**

The plaintiff brings two municipal liability claims against the City under 42 U.S.C. § 1983: (1) a claim based on the City's alleged failure to adopt the traffic safety recommendations in the 2014 traffic study and (2) a claim for a failure to supervise, discipline, and train the NYPD officers. A municipality is not vicariously liable for its employees' actions under Section 1983. *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). Municipalities are, however, liable for "their *own* illegal acts." *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)).

To state a *Monell* claim, the plaintiff must plead five elements: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008). "The fifth element has two separate requirements: a plaintiff must plausibly allege both the existence of a municipal policy and that the policy caused (i.e., was the 'moving force' behind) plaintiff's injury." *Elliott v. City of New York*, No. 23-CV-352, 2024 WL 1119275, at *9 (S.D.N.Y. Mar. 14, 2024) (citation omitted). A plaintiff may satisfy the "official policy" requirement by pleading either "a practice so persistent and widespread, or permanent and well settled, as to constitute a custom or usage with the force of law and to imply the constructive knowledge of policymaking officials," or "a failure to train or supervise subordinates amounting to deliberate indifference to the rights of those with whom the municipality's employees come into contact." *Id*. (internal quotation marks and citation omitted); *see also McLennon*, 171 F. Supp. 3d at 95 ("To survive a motion to dismiss a municipal liability claim, a plaintiff must allege facts tending to support, at least circumstantially,

an inference that . . . a municipal policy or custom exists." (internal quotation marks and citations omitted)).

As discussed below, the plaintiff's *Monell* claims are dismissed because she has not pled facts that plausibly state the existence of an official policy or custom.

### a. Failure to Implement Traffic Safety Recommendations

In 2014, the New York City DOT made traffic safety recommendations in a presentation of nine slides to a community board. (ECF No. 33 ¶ 24.) According to the study, speeding and pedestrian and vehicular traffic accidents were common on Foster Avenue from Kings Highway to Ralph Avenue, an area in which 95 percent of the residents were Black. (*Id.* ¶¶ 22, 23.) The recommendations included roadway design changes, such as installing wide parking lanes, painted buffers, and turn bays. *See generally Foster Avenue: Traffic Calming & Pedestrian Safety Improvements*, N.Y.C. Dep't of Transp. (May 21, 2014), https://www.nyc.gov/html/dot/html/about/projects-2014.shtml. The plaintiff claims that the recommendations would have "substantially improve[d]" "speeding, pedestrian and vehicular traffic safety." (ECF No. 33 ¶ 25.) She also contends that the City "received repeated reports of motor vehicle accidents and complaints of ongoing speeding along Foster Avenue." (*Id.* ¶ 155.) She maintains that the City's refusal to adopt the recommendations in the 2014 study violated her constitutional right to freedom of movement, Title VI of the Civil Rights Act of 1964, and the Fourteenth Amendment. (*Id.* ¶¶ 156, 160.) The City contends that the plaintiff cannot plead the existence of an official policy or custom based only on the City's decision not to implement the recommendations nor can she plead that the City's policy decision was the "moving force" behind her constitutional injuries. (ECF No. 83 at 11–12.)

As an initial matter, the plaintiff does not cite any evidence, such as statistics or substantiated complaints, to show that the City did not implement traffic safety improvements in

9

the Foster Avenue Corridor. *Compare Elliott*, 2024 WL 1119275, at *9 (rejecting motion to dismiss *Monell* claim alleging that the NYPD had a practice of "target[ing] Black and Latine persons" in its enforcement of COVID 19 social-distancing restrictions where the plaintiff cited statistics and multiple sources with sufficient specificity), *with Fantozzi v. City of New York*, No. 21-CV-4439, 2023 WL 4472305, at *5 (S.D.N.Y. July 11, 2023), *aff'd*, No. 23-1111, 2024 WL 1597745 (2d Cir. Apr. 12, 2024) (dismissing a failure-to-supervise claim that relied on an OIG report and unsubstantiated complaints made against the NYPD), *and Delorbe-Bell v. City of New York*, No. 15-CV-2344, 2016 WL 1451581, at *3 (S.D.N.Y. Apr. 12, 2016) (dismissing a failure-to-discipline claim that relied solely on an OIG Report).

But even if the City did not adopt the recommendations of that single study, that is not sufficient to allege municipal liability. *See Jones v. Town of E. Haven*, 691 F.3d 72, 85 (2d Cir. 2012) (evidence of two or three instances of "racially bigoted remarks," excessive force, and racial profiling on the part of police officers over several years "fell far short of showing a policy, custom, or usage of officers to abuse the rights of black people"); *Giaccio v. City of New York*, 308 F. App'x 470, 472 (2d Cir. 2009) ("four examples where the [City] defendants might have disclosed [the former employee plaintiff's] positive drug test results" to the media were insufficient to establish municipal practice for a violation of equal protection). The study was conducted in 2014, more than five years before the accident, and addressed traffic conditions that existed at that time. The City's alleged decision not to adopt the recommendations is therefore too far removed from the accident. *See Gleeson v. Cnty. of Nassau*, No. 15-CV-6487, 2019 WL 4754326, at *16 (E.D.N.Y. Sept. 30, 2019) ("The cases in which other courts in this Circuit rejected the findings of a government report as evidence of a policy or practice involved events that were too far removed . . . to be probative of a then-existing policy or practice."); *see also*

10

*Rodriguez v. City of Westchester*, No. 15-CV-9626, 2017 WL 118027, at *7 (S.D.N.Y. Jan. 11, 2017) (DOJ report written more than six years before the events in the complaint was "too stale, and too disconnected in personnel, to plausibly allege a policy, practice, or custom"); *Melvin v. Cnty. of Westchester*, No. 14-CV-2995, 2016 WL 1254394, at *15 (S.D.N.Y. Mar. 29, 2016) (DOJ letter written more than four years before the events in the complaint was too remote in time). With respect to the plaintiff's allegations of community concerns over traffic safety, "[these] allegations lack specificity as to how many complaints were made, to whom, or over what period of time they were made." *Clarke v. Antonini*, No. 21-CV-1877, 2024 WL 1347578, at *8 (S.D.N.Y. Mar. 29, 2024) (internal quotation marks and citation omitted).

Accordingly, the claim against the City based on its failure to adopt traffic safety recommendations is dismissed.[7]

### b. Failure to Supervise, Discipline, and Train

To succeed on a municipal liability claim for failure to supervise, discipline, or train, a plaintiff must establish "deliberate indifference." *Kosmidis v. Port Auth. of New York & New Jersey*, 2021 WL 4442812, at *7 (S.D.N.Y. Sept. 28, 2021) (quoting *Green v. City of New York*, 465 F.3d 65, 80–81 (2d Cir. 2006)). A plaintiff may satisfy the "deliberate indifference" requirement by pleading that (1) "a policy-maker knows to a moral certainty that her employees will confront a given situation;" (2) "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of

---

[7] Because the plaintiff cannot allege an official custom or practice, the Court does not address whether the plaintiff's constitutional rights were violated, except to note that the plaintiff does not allege that she is a member of a protected class, which is necessary to plead a violation of equal protection based on race discrimination. *See Patterson v. City of New York*, No. 16-CV-3525, 2017 WL 3432718, at *12 (E.D.N.Y. Aug. 9, 2017), *aff'd*, 758 F. App'x 217 (2d Cir. 2019) ("A successful Equal Protection claim must show that the defendant intentionally discriminated against the plaintiff based on the plaintiff's membership in a protected class.").

11

employees mishandling the situation;" and (3) "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Id.* (citation omitted). The plaintiff must demonstrate that there was an obvious need for more or better protocols or supervision to protect against constitutional violations, by, for example, proof of repeated complaints of civil rights violations. *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995). "Deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Id.*

The plaintiff argues that the City was deliberately indifferent to the need to train, supervise, and discipline the defendant officers, who she claims violated her rights to equal application of the laws under the Fourteen Amendment and equal access to the courts when they did not activate their body cameras and did not investigate the accident properly. (ECF No. 33 ¶¶ 93–94, 96–97, 151, 166.) The City argues that the plaintiff has made "no allegations regarding any related purported custom or policy at NYPD of incomplete investigations of automobile collisions" (ECF No. 83 at 12) and that "the isolated acts of City employees are insufficient for liability to attain against the City" (*id.* at 7).

The plaintiff has not made the requisite showing of deliberate indifference. She does not "include any information about the NYPD's training" or supervisory procedures and "has not alleged that the 'policymaker fail[ed] to make meaningful efforts to address the risk of harm to [the] plaintiff[].'" *Fantozzi*, 2023 WL 4472305, at *5 (citation omitted). Moreover, the plaintiff does not cite "other instances of police misconduct which could be attributed to a failure to train." *Triano v. Town of Harrison, N.Y.*, 895 F. Supp. 2d 526, 539 (S.D.N.Y. 2012). A single incident of alleged wrongdoing by individual police officers is not enough to sustain a Section 1983 claim against a municipality. *See Bird v. Cnty. of Westchester*, No. 20-CV-10076, 2022

WL 2263794, at *12 (S.D.N.Y. June 23, 2022) ("[The] [p]laintiff fails to allege the existence of any other similar incident, which dooms [the p]laintiff's claim because a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality." (internal quotation marks and citation omitted)); *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870 (S.D.N.Y. 1992) (noting that a "municipal agency may not be held liable under § 1983 simply for the isolated unconstitutional acts of its employees").

Accordingly, the claim against the City on the theory of a failure to train, supervise, and discipline is dismissed.

## II.     Denial of Access to the Courts

The plaintiff also brings a claim for denial of access to the courts under 42 U.S.C. § 1983 against eight officer defendants. She claims that she could not get access to evidence that would have enabled her to hold Shaw "criminally and civilly accountable for his actions" because the defendant officers did not activate their body cameras and did not investigate the car accident properly. (ECF No. 33 ¶ 164.) The defendants argue that the plaintiff has not alleged that she was completely foreclosed from pursuing judicial remedies or that the inadequate investigation of the car accident was a cover-up. (ECF No. 77 at 8–9; ECF No. 78 at 13–14; ECF No. 81 at 10–11; ECF No. 83 at 14–15.)

A claim for denial of access to the courts may be brought as a "(1) forward-looking claim[], in which systematic official action frustrates a plaintiff . . . in preparing and filing suits at the present time" or "(2) backward-looking claim[], which cover[s a] claim[] not in aid of a class of suits yet to be litigated, but of specific cases that cannot now be tried (or tried with all material evidence), no matter what official action may be in the future." *Stevens v. Webb*, No. 12-CV-2909, 2014 WL 1154246, at *7 (E.D.N.Y. Mar. 21, 2014) (cleaned up). The plaintiff asserts a backward-looking claim. (ECF No. 85 at 21.)

13

The Second Circuit has not adopted a test for evaluating backward-looking claims, *Oudekerk v. Doe #1*, No. 24-CV-0113, 2024 WL 2830579, at *6 (N.D.N.Y. June 4, 2024), and "[t]he viability of backward-looking right-of-access claims is far from clear," *Sousa v. Marquez*, 702 F.3d 124, 128 (2d Cir. 2012) (citation omitted). In general, courts in this circuit consider four elements. *Jean-Laurent v. Lawrence*, No. 12-CV-1502, 2015 WL 1208318, at *4 (S.D.N.Y. Mar. 17, 2015). The plaintiff must plead (1) "a nonfrivolous, arguable underlying claim," (2) "that the defendant took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim," (3) "that the defendant's alleged conduct was deliberate and malicious," and (4) "that the defendant's actions resulted in an actual injury to the plaintiff." *Id.* (internal quotation marks and citations omitted). "[I]f recognized, [backward-looking claims] would be available only if the government action caused the plaintiff's suit to be dismissed as untimely, . . . . or if official misconduct was so severe as to render[ ] hollow his right to seek redress, . . . [such as] if a judicial remedy was completely foreclosed by false statement or nondisclosure." *Sousa*, 702 F.3d at 128. (internal quotation marks and citations omitted).

At this stage, "it is premature to allege that the [d]efendants' alleged misconduct has 'completely foreclosed' any judicial remedy against the [d]efendants." *Ighault v. City of New York*, No. 22-CV-3196, 2024 WL 1623321, at *3 (E.D.N.Y. Apr. 15, 2024) (citing *Sousa*, 702 F.3d at 128). Indeed, the plaintiff's state law claims "will survive this decision." *Id.*[8] Accordingly, the plaintiff has not demonstrated that she is precluded from litigating her state law claims in state court. *See Kern v. Contento*, No. 21-1672, 2022 WL 1112767, at *3 (2d Cir. Apr. 14, 2022) ("Because [the plaintiff] is actively litigating the state law claims underlying her

---

[8] As explained below, the Court declines to exercise supplemental jurisdiction over the plaintiff's state law claims.

14

access claim, what effect (if any) the alleged misconduct had on those underlying claims cannot now be determined."); *Taranto v. Putnam Cnty.*, No. 21-CV-2455, 2023 WL 6318280, at *13 (S.D.N.Y. Sept. 28, 2023) (dismissing the plaintiffs' backward-looking access claim where the "[p]laintiffs' claims are clearly not foreclosed as they are bringing them in this very Action and have not argued that any claims have been foreclosed").

Accordingly, the plaintiff's claim for denial of access to the courts is dismissed.[9]

## III.   State Law Claims

Finally, the plaintiff alleges New York Dram Shop Act, negligence, and negligence *per se* claims. Because the Court has dismissed the plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over her state law claims. *See Brzak v. United Nations*, 597 F.3d 107, 113–14 (2d Cir. 2010) ("We have said that if a plaintiff's federal claims are dismissed before trial, the state claims should be dismissed as well." (internal quotation marks and citation omitted)); *Wolfinger v. Consol. Edison Co. of N.Y., Inc.*, No. 17-CV-1710, 2018 WL 3637964, at *12 (E.D.N.Y. July 31, 2018) ("Where a court dismisses all claims over which it has original jurisdiction, it may, in its discretion, decline to exercise supplemental jurisdiction over remaining claims." (citing 28 U.S.C. § 1367(c)(3))).

---

[9] Because the plaintiff did not state a claim for denial of access to the courts, the Court does not address the defendants' arguments that they are entitled to qualified immunity.

## CONCLUSION

For the reasons above, the plaintiff's federal claims are dismissed. The Court declines to exercise jurisdiction over the plaintiff's state law claims.

**SO ORDERED.**

s/Ann M. Donnelly
_____
ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
       August 8, 2024